Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK KISTENMACHER, derivatively on behalf of WORKHORSE GROUP INC., | Case No.: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| DUANE A. HUGHES, STEVE SCHRADER, RAYMOND CHESS, GERALD B. BUDDE, H. BENJAMIN SAMUELS, HARRY DEMOTT, MICHAEL L. CLARK, PAMELA S. MADER, and JACQUELINE A. DEDO, | |
| Defendants, | |
| and | |
| WORKHORSE GROUP INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **INTRODUCTION**

Plaintiff Mark Kistenmacher ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Workhorse Group Inc. ("Workhorse" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Duane A. Hughes, Steve Schrader, Raymond Chess, Gerald B. Budde, H. Benjamin Samuels, Harry DeMott, Michael L. Clark, Pamela S. Mader, and Jacqueline A. Dedo (collectively, the "Individual Defendants," and together with Workhorse, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Workhorse and violation of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Workhorse, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action seeking recovery for misconduct committed by Workhorse's directors and officers from July 7, 2020 through February 23, 2021, both dates inclusive (the "Relevant Period").

2.      Workhorse is a Nevada corporation, based in Ohio, that manufactures electric vehicles. The Company was founded in November 2007 and began operations in

December 2009. It has incurred net losses each year resulting in a sizeable, accumulated deficit.

3.    In search of a way to boost its operations and begin turning a profit, Workhorse pursued a vehicle manufacturing contract with the United States Postal Service ("USPS"), estimated to be worth up to $6.3 billion.

4.    The USPS's vehicles constitute about a third of the U.S. government's vehicle fleet but many are extremely old, do not possess now-standard functions like air-conditioners or air bags, and are near or past their expected expiration date. This has led to fires, breakdowns, and costly maintenance for the USPS over time.

5.    In January 2015, the USPS announced its Next Generation Delivery Vehicles program, a years-long process aimed at replacing USPS's aging fleet with newer vehicles, some of which will be electric.

6.    The Individual Defendants caused the Company to consistently make statements via the Company's Twitter account, throughout the Relevant Period, which indicated a likelihood that Workhorse would secure the USPS Next Generation Delivery Vehicles program contract. The Individual Defendants also caused statements to appear in the Company's SEC filings declaring Workhorse's internal controls to be effective. Moreover, in a number of interviews preceding the USPS's announcement of the contract winner, Defendants Duane A. Hughes ("Hughes") and Steve Schrader ("Schrader") implied that the Company would be selected for the USPS contract because it was the only U.S.-based electric vehicle manufacturer remaining. Despite these public claims, Workhorse had no indication that it was likely to win the USPS contract and the USPS did not plan to electrify more than fraction of its fleet. Defendants Hughes' and Schrader's statements in these interviews and the Tweets the Individual Defendants caused the Company to make throughout the Relevant Period led investors to believe both that the Company was poised to win the USPS contract and electrify a substantial portion of USPS's fleet. This scheme inflated the Company's stock price while six of the

Verified Shareholder Derivative Complaint

Individual Defendants engaged in lucrative insider sales collectively valued at $62.3 million.

7.    On February 23, 2021, USPS announced that it had awarded a 10-year contract to Oshkosh Defense to manufacture a new generation postal delivery vehicle, revealing the truth to hopeful Workhorse shareholders.

8.    On this news, the price of the Company's common stock dropped a remarkable $14.87 per share, or about 47.4%, from $31.34 per share at the close of trading on February 22, 2021 to $16.47 at close on February 23, 2021. The price continued to decline in after-hour trading by an additional $2.40, or about 14.6%, opening on February 24, 2021 at $14.07 per share. In total, over that time, the Company's stock dropped $17.27, or about 55.1%.

9.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Workhorse's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Workhorse had no indication it would secure the Next Generation Delivery Vehicle contract with USPS; (2) USPS was not planning on electrifying all or most of its fleet due to the extreme cost that would incur; and (3) the Company failed to maintain adequate internal controls. Due to these facts, Workhorse's public statements were materially false and misleading throughout the Relevant Period.

10.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

11.    In yet further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     Moreover, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales, for proceeds of over $62.3 million.

13.     In light of the Individual Defendants' actions, which have subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), the need to undertake internal investigations, and the need to implement adequate internal controls over its financial reporting, the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Workhorse's Board of Directors (the "Board") cannot independently and disinterestedly consider a demand to commence litigation on behalf of Workhorse against themselves.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Complaint

18.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business in this District or an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.    Venue is proper in this District, pursuant to 28 U.S.C. §§ 1391 and 1401, because a substantial portion of the transactions and wrongs complained of occurred in this District and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.    Venue is also proper in this District because Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Workhorse common stock. Plaintiff has continuously held Workhorse common stock at all relevant times.

### Nominal Defendant Workhorse

22.    Workhorse is a Nevada corporation with principal executive offices at 100 Commerce Drive, Loveland, Ohio 45140. Workhorse's shares trade on the NASDAQ under the ticker symbol "WKHS."

### Defendant Hughes

23.    Defendant Hughes has been the Company's CEO and a Company director since February 2019.[1] Previously, was the Company's Chief Operating Officer and President from August 2016 until January 2019.

---

[1] Different SEC filings of the Company list Defendant Hughes' appointment in these roles as occurring in either in February 2019 or November 2019. The earlier filed report, a current report filed with the SEC on Form 8-K on February 5, 2019, stated that Defendant Hughes' appointment as CEO and a member of the Board was effective February 4, 2019.

Verified Shareholder Derivative Complaint

24.    For the fiscal year ended December 31, 2020 ("Fiscal Year 2020"), Defendant Hughes received $1,334,750 in compensation from the Company, including $475,000 in salary, $475,000 in stock awards, and $384,750 in non-equity incentive plan compensation.

25.    During the period when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant Hughes made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 13, 2020 | 62,513 | $16.46 | $1,028,963.98 |
| September 17, 2020 | 50,000 | $25.78 | $1,289,000.00 |
| October 16, 2020 | 50,000 | $23.00 | $1,150,000.00 |
| December 15, 2020 | 55,989 | $21.61 | $1,209,922.29 |
| January 4, 2021 | 25,000 | $20.73 | $518,250.00 |
| January 7, 2021 | 100,000 | $25.00 | $2,500,000.00 |
| January 26, 2021 | 200,000 | $29.00 | $5,800,000.00 |
| February 1, 2021 | 25,000 | $35.97 | $899,250.00 |

Thus, in total, while the Company's stock price was artificially inflated, he sold 568,502 Company shares on inside information, for which he received approximately $14.4 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

**Defendant Schrader**

26.    Defendant Schrader has been the Company's CFO since December 2019.

27.    According to his December 19, 2019 employment agreement, for Fiscal Year 2020, *inter alia*, Defendant Schrader was entitled to at least $275,000 in base salary which would automatically increase to $300,000 upon the filing of certain quarterly reports with the SEC following Fiscal Year 2020. In addition Defendant Schrader was entitled to a cash bonus as determined by the Compensation Committee based upon the level of achievement of certain performance goals. His target bonus would be 50% of his base salary which could increase up to 75% of his base salary. Defendant Schrader was

also entitled to $275,000 in equity awards and to receive additional equity incentive grants subject to certain conditions.

28.    During the period of time when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant Schrader made the following sale of Company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 14, 2020 | 15,152 | $21.92 | $332,131.84 |

His insider sale demonstrates his motive in facilitating and participating in the scheme.

**Defendant Chess**

29.    Defendant Raymond Chess ("Chess") has been a Company director since October 2013 and Chairman of the Board since December 2015. He is also a member of the Nominating and Corporate Governance Committee.

30.    For Fiscal Year 2020, Defendant Chess received $135,000 in compensation from the Company, including $65,000 in fees earned or paid in cash and $70,000 in stock awards.

31.    During the period when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 15, 2020 | 27,365 | $16.34 | $447,144.10 |
| August 17, 2020 | 4,000 | $15.32 | $61,280.00 |
| September 15, 2020 | 4,000 | $25.41 | $101,640.00 |
| October 15, 2020 | 4,000 | $22.39 | $89,560.00 |
| November 16, 2020 | 4,000 | $19.26 | $77,040.00 |
| December 18, 2020 | 5,000 | $21.05 | $105,250.00 |
| January 7, 2021 | 10,000 | $24.77 | $247,700.00 |
| January 15, 2021 | 4,853 | $24.46 | $118,704.38 |
| February 16, 2021 | 5,000 | $35.98 | $179,900.00 |

Verified Shareholder Derivative Complaint

Thus, in total, while the Company's stock price was artificially inflated, he sold 68,218 Company shares on inside information, for which he received approximately $1.4 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

### Defendant Budde

32.    Defendant Gerald B. Budde ("Budde") has been a Company director since December 2015. He is also the Chair of the Audit Committee.

33.    For Fiscal Year 2020, Defendant Budde received $114,167 in compensation from the Company, including $54,167 in fees earned or paid in cash and $60,000 in stock awards.

### Defendant Samuels

34.    Defendant H. Benjamin Samuels ("Samuels") has been a Company director since December 2015. He is also as a member of both the Audit Committee and the Compensation Committee.

35.    For Fiscal Year 2020, Defendant Samuels received $114,167 in compensation from the Company, including $54,167 in fees earned or paid in cash and $60,000 in stock awards.

36.    During the period when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant Samuels made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 18, 2020 | 500,000 | $16.65 | $8,325,000.00 |
| November 20, 2020 | 99,999 | $25.01 | $2,500,974.99 |
| January 4, 2021 | 99,999 | $20.73 | $2,072,979.27 |
| January 7, 2021 | 99,999 | $26.00 | $2,599,974.00 |
| January 26, 2021 | 299,997 | $30.00 | $8,999,910.00 |

Thus, in total, while the Company's stock price was artificially inflated, he sold 1,099,994 Company shares on inside information, for which he received approximately

$24.5 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

**Defendant DeMott**

37.    Defendant Harry DeMott ("DeMott") has been a Company director since September 2016. He is also as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

38.    For Fiscal Year 2020, Defendant DeMott received $114,167 in compensation from the Company, including $54,167 in fees earned or paid in cash and $60,000 in stock awards.

39.    During the period when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant DeMott made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 28, 2020 | 50,000 | $26.14 | $1,307,000.00 |
| December 14, 2020 | 62,450 | $21.92 | $1,368,904.00 |

Thus, in total, while the Company's stock price was artificially inflated, he sold 112,450 Company shares on inside information, for which he received approximately $2.7 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

**Defendant Clark**

40.    Defendant Michael L. Clark ("Clark") has been a Company director since October 2018. He is also the Chair of the Compensation Committee and a member of the Audit Committee.

41.    For Fiscal Year 2020, Defendant Clark received $114,167 in compensation from the Company, including $54,167 in fees earned or paid in cash and $60,000 in stock awards.

**Defendant Mader**

42.    Defendant Pamela S. Mader ("Mader") has been a Company director since

Verified Shareholder Derivative Complaint

May 2020. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

43.    For Fiscal Year 2020, Defendant Mader received $68,333 in compensation from the Company, including $33,333 in fees earned or paid in cash and $35,000 in stock awards.

44.    During the period when the Company materially misstated information to the investing public, and before the scheme was exposed, Defendant Mader made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares Sold | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 24, 2020 | 8,000 | $30.00 | $240,000.00 |

Her insider sale demonstrates her motive in facilitating and participating in the scheme.

**Defendant Dedo**

45.    Defendant Jacqueline A. Dedo ("Dedo") has served as a Company director since May 2020. She is also the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

46.    For Fiscal Year 2020, Defendant Dedo received $68,333 in compensation from the Company, including $33,333 in fees earned or paid in cash and $35,000 in stock awards.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

47.    Workhorse designs and manufactures all battery-electric delivery vehicles and drones. The Company's core business is making vehicles which take goods from a transportation hub to a final destination, known as "last-mile" delivery.

48.    The Company has incurred net losses every year and as of December 31, 2020, the Company had an accumulated deficit of approximately $109 million. Workhorse had negative cash flow from its operating activities amounting to $70.3 million, $36.9 million, and $21.8 million for the fiscal years ended December 31, 2020, 2019, and 2018, respectively. According to a March 1, 2021 article published by *The*

*Verge*, the Company has been "able to survive thanks to loans from hedge funds and by selling off parts of its business."

49.    In May 2019, President Donald Trump tweeted that Workhorse had agreed to purchase a former General Motors factory in Lordstown, Ohio.

50.    Workhorse's founder and former CEO, Steven Burns ("Burns"), had started a new company, Lordstown Motors ("Lordstown"), which planned to purchase the factory. Burns estimated that Lordstown needed around $450 million to purchase and renovate the facility for it to begin production. Lordstown planned to build a simple electric truck which was originally a Workhorse project was postponed as Workhorse ran low on funds. To facilitate the deal, Lordstown licensed the intellectual property it needed to manufacture those trucks from Workhorse and, in exchange, Workhorse received a 10% ownership stake in Lordstown, a 1% royalty fee on the gross sales price of the first 200,000 vehicles sold, and a 1% stake in any funding secured by Lordstown.

51.    In an interview with *The Verge*, published on March 11, 2020, Burns explained that he founded Lordstown since it would have been "impossible" for Workhorse to raise the capital necessary to fund the production of a commercial 7,500-pound light-duty pickup truck. The article stated that the Company's business was at a "standstill" as it pursued the contract with USPS.

52.    As of March 1, 2021, according to *The Verge*, Defendants Hughes and Schrader claimed that the Company had backlog of over 8,000 orders. However, according to the article, the Company was manufacturing less than three trucks per day as of March 2021 while the Company's break-even point was approximately 200 vehicles per month.

53.    On October 12, 2020, the Company issued a press release entitled "Workhorse Secures $200 Million Financing from Institutional Lenders." This press release announced that the Company had entered into a note purchase agreement under which it would sell $200 million aggregate principal amount of its 4% senior secured

convertible notes due 2024 to two institutional lenders. The agreement provided that those notes would be convertible into common stock by the holders at $36.14 per share—a premium of 35% more than the closing price of the Company's common stock on October 9, 2020—subject to certain potential closing adjustments.

54.     As evidenced by its desperate attempts to raise capital, the Company needed the USPS Next Generation Delivery Vehicle contract to provide revenue and a path to profitability.

### USPS's Current Vehicles

55.     The USPS operates one of the world's largest civilian delivery vehicle fleets amounting to approximately 215,000 vehicles. Many of these vehicles entered service in 1986 and are now exceeding their expected service life of 24 years. Some lack basic features like air conditioning and airbags, and on occasion one of these vehicles catches fire.

### USPS's Plan for New Vehicles

56.     In January 2015, USPS publicly began the Next Generation Delivery Vehicles acquisition process with a Request for Information and meeting open to all interested suppliers to respond and participate.

57.     USPS determined that fifteen suppliers had prequalified to submit proposals to develop prototypes for the Next Generation Delivery Vehicles. In October 2015, USPS issued another Request for Information which included a statement of objectives in response to feedback it had received from the suppliers. The potential suppliers, including Workhorse—which had paired with commercial-truck specialist St Engineering Hackney, Inc. until they parted ways in December 2019—were given access to USPS's processing and delivery environment and employees in preparation for their submission of proposals for delivery vehicle design.

58.    USPS awarded contracts to some of these suppliers, including Workhorse, to develop prototypes which USPS then tested in a range of different climates, topographies, population centers, and delivery environments.

59.    The Company's annual report for the fiscal year ended December 31, 2019, filed on Form 10-K with the SEC on March 13, 2020, stated the following regarding this process:

U.S. Post Office Replenishment Program / Next Generation Delivery Vehicle Project

Workhorse was one of the five participants that the United States Postal Service ("USPS") selected to build prototype vehicles for the USPS Next Generation Delivery Vehicle ("NGDV") project. The USPS has publicly stated that approximately 165,000 vehicles are to be replaced. In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract. In 2019, the vehicles completed the required testing protocol as specified by the USPS. The USPS published a Request for Proposals in December 2019 for the Production Program.

60.    The Next Generation Delivery Vehicle contract was estimated to be worth approximately $6.3 billion, a meaningful sum for any company but especially for Workhorse which desperately needed funds.

**USPS's Financial Problems**

61.    The USPS's longstanding financial troubles have been widely publicized for more than a decade. According to USPS's quarterly report for the fiscal quarter ended December 31, 2020 filed on Form 10-Q with the Postal Regulatory Commission, since December 2006 when the Postal Accountability and Enhancement Act ("PAEA") became law, the USPS has incurred cumulative net losses of approximately $86.7 billion.

62.    An August 21, 2020 article published by *Barron's* articulated four possible explanations for USPS's consistent financial problems: (i) it is not necessarily set up to make money as a quasi-government agency; (ii) USPS is highly regulated by Congress and lacks control over key aspects of its business such as pricing subjecting it business

model to the whims of politics rather than the rigors of the market; (iii) the PAEA required USPS to prefund 75 years' worth of retiree health benefits in ten years—a $110 cost; and (iv) weak demand, caused generally by the advent of the Internet and worsened by the coronavirus pandemic.

63.     Though USPS is meant to be self-funded, in March 2020 Congress devoted billions of dollars in stimulus funds for USPS to borrow to maintain the flow of mail and packages during the coronavirus pandemic. Even with these funds, USPS remained concerned that it could withstand the significant downturn in its business resulting from the coronavirus pandemic.

**False and Misleading Statements**

*July 7, 2020 Interview*

64.     On July 7, 2020, *Benzinga*, a financial media outlet, published an interview with Defendant Schrader entitled: "Workhorse's CFO On Meteoric Stock Rise, Electric Delivery Vehicle Maker's Capital Plans." In the course of the interview, Defendant Schrader was asked: "How does Workhorse separate itself from the competition?" Defendant Schrader responded that Workhorse's "trucks don't have a transmission, so we can save postal services upward of 60% of vehicle costs" and that Workhorse's "truck will cost fleets 40 cents a mile compared to the current $1 per mile."

*July 21, 2020 Interview and Tweet*

65.     On July 21, 2020, Defendant Schrader appeared on *Benzinga*'s live show, *PreMarket Prep*, for another interview. A video of this interview appeared in an online *Benzinga* article entitled: "Workhorse CFO Talks USPS Contract, Says Company has 2-Year Lead on Competitors." The video was also posted to *Benzinga*'s YouTube page bearing the title: "PreMarket Prep: All about EV stocks with the Workhorse CFO $WKHS." That same day, the Company posted a link to the YouTube video on Workhorse's Twitter account with the caption: "Workhorse CFO chats with Benzinga." According to the *Benzinga* article, "Schrader [] provided an update on the $6 billion U.S.

Postal Service contract for its next-generation mail trucks. Workhorse is one of four remaining participants bidding for the contract. Schrader said he can't discuss too much about the process at this point, but Workhorse is the only all-electric option."

66.    Defendant Schrader further called the Company's "all-electric" vehicle "perfect" for USPS, stating:

> "What I will say is our all-electric is probably the perfect vehicle for them. When you think about what the Post Office does, 70% of their trucks go about 17 to 18 miles a day and make 700 stops--mailbox, mailbox, mailbox. Ours runs more like a golf cart, so that's really what you need. Right now they get five to six miles per gallon. Ours get more than 40 miles per gallon equivalent," Schrader said.

67.    The *Benzinga* article continued that Defendant Schrader "said Workhorse vehicles have half the maintenance costs of the current USPS fleet" and quoted him as saying "I think ***it's a great opportunity for us***. Obviously***, if we were to get the full award or a decent-sized award, that would be transforming for the company***." (Emphasis added.)

### *August 6, 2020 Interview*

68.    On August 6, 2020, Defendant Hughes appeared on *Fast Money*, a *CNBC* television show hosted by Melissa Lee ("Lee"). The next day, August 7, 2020, Workhorse made the video available via Twitter account. The interview contained the following exchange, in pertinent part:

> Lee:        What can you tell us about the status of the U.S. Postal Service potential contract? That contract could be worth as much as about five to six billion dollars**.** You could get a partial award; you could get a full award. You submitted the RFP, I think, mid-July. When will you know? Your CFO recently said that this award would be transformative for the company. I would imagine that would be so, if your cash position right now is about a hundred million; I mean, that contract could be truly changing for your company.
>
> Hughes:    Yeah, I would say any contract like that would be changing for any company, virtually. In our case, we're unable to speak

about the Post Office at all. I have to say no comment because we're under a gag order not to talk about it. But certainly, to your point, any contract that's worth billions of dollars coming into a company like ours would be a very company-changing experience.

### *August 10, 2020 Quarterly Report*

69.    On August 10, 2020, the Company filed its quarterly report for the fiscal quarter ended June 30, 2020 with the SEC on Form 10-Q (the "2Q 2020 10-Q"). The 2Q 2020 10-Q was signed by Defendants Hughes and Schrader, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2Q 2020 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

70.    The 2Q 2020 10-Q stated the following about the Company's internal controls:

There were no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the six months ended June 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *September 21, 2020 Proxy Statement*

71.    On September 21, 2020, the Company filed a proxy statement on Schedule 14A with the SEC (the "2020 Proxy Statement"). Defendants Budde, Chess, Clark, DeMott, Hughes, and Samuels solicited the 2020 Proxy Statement and it contained material misstatements and omissions.

72.    The 2020 Proxy Statement solicited shareholder approval of: (1) the election of eight directors; (2) the issuance of the maximum number of shares of the Company's common stock issuable in connection with the potential future (i) conversion of the a senior secured convertible note for the principal amount of $70 million issued pursuant of

the Securities Purchase Agreement dated June 30, 2020, and (ii) delivery of shares of the Company's common stock in lieu of cash payments of interest and principal on that note (the "Issuance Proposal"); and (3) the ratification of the Company's independent auditor for the Fiscal Year 2020.

73.    The 2020 Proxy Statement stated that a corporate governance document maintained by the Company, the Code of Ethics, "applies to all of our directors, officers and employees including our Chief Executive Officer and Chief Financial Officer and principal accounting officer."

74.    The 2020 Proxy Statement was false and misleading because the Code of Ethics was not followed by the Individual Defendants as they made and caused the Company to make numerous false and misleading statements and failed to report these and other violations of the Code of Ethics.

75.    The 2020 Proxy Statement also made false and misleading statements concerning executive compensation. While the 2020 Proxy Statement stated that the Company utilized "pay-for-performance" elements in setting executive compensation, it failed to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

76.    The Individual Defendants caused and/or permitted the 2020 Proxy Statement to be materially false and misleading by failing to disclose that: (1) Workhorse had no indication it would secure the Next Generation Delivery vehicle contract with USPS; (2) USPS was not planning on electrifying all or most of its fleet due to the extreme cost that would incur; and (3) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

### October 29, 2020 Interview and Tweet

77.    On October 29, 2020, Defendant Schrader appeared on *Benzinga* again, for an interview with Steve Israel ("Israel"). Video of the interview was contained in an

article on *Benzinga*'s website: "Workhorse CFO Steve Schrader On The Status Of The USPS Contract, Delivery Guidance, And What Stands In Their Way." The video also appeared on *Benzinga's* YouTube page entitled: "USPS, Drones. & Production Outlook | Workhorse CFO Steve Schrader | Benzinga Exclusive." The Company also shared a link to the video on the Company's Twitter account with the caption: "Workhorse CFO Steve Schrader." The following exchange occurred during the interview, in pertinent part:

| Israel: | Can you just refresh us on what this deal would mean for Workhorse? |

| Hughes: | Well, the Post Office is bidding out 165,000 vehicles, so it's a huge fleet opportunity. And I think, from our standpoint, it would be transforming, right, from a standpoint of, just, now [we're] delivering a few vehicles and getting some revenues in and we have a backlog of about twelve hundred orders. But, you know, the Post Office would be 165,000 vehicles over a certain time period, too. So, it would be transforming. It would be a big opportunity for us. |

| Israel: | Do you expect, when they do award the contract, do you expect to be like the only recipient, the only winners, or do you expect to be one of several, or do you have any expectations there? |

| Schrader: | I don't think we have expectations one way or the other. It's, again, we can't comment on it. I think it's up to the Post Office and what they want to do and, at least publicly, they've said that they'll let everybody know by the end of the year. |

***November 9, 2020 Form 10-Q***

78.    On November 9, 2020, the Company filed its quarterly report for the quarter ended September 30, 2020 with the SEC on Form 10-Q (the "3Q 2020 10-Q"). The 3Q 2020 10-Q was signed by Defendants Hughes and Schrader, and contained SOX certifications also signed by Defendants Hughes and Schrader attesting to the accuracy of the financial statements contained in the 3Q 2020 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

79.    The 3Q 2020 10-Q said of the Company's internal controls, in relevant part:

There were no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the nine months ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***January 26, 2021 Tweet***

80.    On January 26, 2021, the Company tweeted through the Workhorse Twitter account: "Thank you President Biden for your continued support for American-made Electric Vehicles. #workhorsegroup"

***January 27, 2021 Tweets and Interview***

81.    On January 27, 2021, the Company tweeted through the Workhorse Twitter account: "Our obsession is the perfect delivery and nothing is going to slow us down. #finalmile" accompanied by the following photograph:



82.    That same day, January 27, 2021, Defendant Schrader appeared with Simranpal Singh ("Singh"), the host of a popular YouTube channel. Singh's YouTube channel published video of the interview entitled: "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER! USPS CONTRACT UPDATE! | WKHS STOCK." The Company shared the video on Workhorse's Twitter account with the caption: "EXCLUSIVE INTERVIEW WITH WORKHORSE CFO STEVE SCHRADER." Defendant Schrader stated the following during the interview:

***It's positive what we're seeing from the administration,*** you know, ***President Biden just five days into his presidency has kind of pushed electric vehicles for all government agencies***. That's a positive that, you know, not only that I think ***he pushed it for all-American, he pushed [electric vehicles] for the fleets he pushed all-American and he pushed small business,*** so I think that we were happy to hear all that. I that that Secretary of Transportation nominee Pete Buttigieg has also talked about spending some money on infrastructure so I think the current administration is very positive about [electric vehicles] and it's a little different from a government standpoint as you usually have the government pushing things that is [sic] not ready for the commercial market, in this case commercial markets there you got interest from the customers on both sides and the investment side so money is going into [electric vehicles] as we can see as well so it's actually the government maybe is lagging behind a little even the states are ahead, California and New York with voucher programs, infrastructure support. It's actually the federal government that has them, but now that the federal government is putting their full force behind ***it and always helps to get the federal government behind an industry, especially ours.***

(Emphasis added.)

### January 28, 2021 Interview and Tweet

83.    On January 28, 2021, Defendant Schrader joined Jack Spencer ("Spencer"), the host of another popular YouTube channel. Spencer's YouTube channel published video of the interview entitled: "HUGE WORKHORSE STOCK UPDATES VIA STEVE SCHRADER - WKHS CFO." The Company shared video of the interview on Workhorse's Twitter account with the caption: "Steve Schrader talks with Jack Spencer." During the interview, the following exchange occurred, in pertinent part:

Spencer:    So, Workhorse has been doing fantastic things as of late, over the last month or so in particular, and there's a few things I really want to speak about today. Now the first one is, Steve, I'd just like to hear your thoughts on Biden saying that the entire federal fleet will be replaced with electric vehicles, specifically American electric vehicles. And I know we can't speak about the USPS contract, even though that's what the entire comment section is probably asking us about, but I'd just like to get your thoughts on his statements and what it could potentially mean for Workhorse going forward.

Schrader:    *Yeah, I think the President's announcement was huge, for several reasons, right?* It's, one, supportive of the E.V. ("electric vehicle") market.

It's, two, all-American, like you said, all-American product buy. And I think he also said a lot about small businesses, and purchasing, whether it be parts or final products, from small businesses, too. So, I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait and so I think that, putting a move on that was very quick too. *I think it's also meaningful that, when you think about it, when the government gets behind things, things happen*.

And in this case, it's, the government actually is maybe somewhat behind the commercial market. As you well know, customers are already demanding these products, right? Investors are already looking at companies that are making these products, so I think everybody sees that E.V.s are kind of the way of the future going forward, and they see – customers see – the savings opportunities and I think what probably has, the only thing that has been missing, to some extent, is that now you've got the government behind it, from a standpoint of environmental, you know, and just – savings opportunities going forward. *So, yeah, having the government push us and the President come out, like I said, five days after his inauguration, is huge*.

Spencer:    It was nice and quick. And as you just said, I think that's exactly what we wanted to see. I mean, we've spoken a few times now and you've made it very evident that a lot of the people who actually want to buy these trucks – I think every fleet manager in the country at this stage is now heavily contemplating E.V. more so than traditional[] vehicles, from a savings point of view. I think the government to an extent were a little bit behind, so they're seeing something like this come from the President himself, that has to be a huge catalyst to pretty much everybody involved, especially the all-American owned ones, which we know you guys stand very heavily for.

> So that's awesome; that's just awesome. And that, obviously,
> it's a very good thing.

Schrader:     ***Yes. It's a very good thing*** . . . .

(Emphasis added.)

84.     The Individual Defendants caused and/or permitted the statements in ¶¶ 64–70 and 77–83 to be materially false and misleading and failed to disclose that: (1) Workhorse had no indication it would secure the Next Generation Delivery vehicle contract with USPS; (2) USPS was not planning on electrifying all or most of its fleet due to the extreme cost that would incur; and (3) the Company failed to maintain adequate internal controls. As a result, Workhorse's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

85.     On February 23, 2021, USPS announced that USPS had awarded the Next Generation Delivery Vehicle contract to Oshkosh Defense in a press release titled: "U.S. Postal Service Awards Contract to Launch Multi-Billion-Dollar Modernization of Postal Delivery Vehicle Fleet." The press release stated the following, in relevant part:

> WASHINGTON, DC — The U.S. Postal Service announced today it
> awarded a 10-year contract to Oshkosh, WI, based Oshkosh Defense, to
> manufacture a new generation of U.S.-built postal delivery vehicles that will
> drive the most dramatic modernization of the USPS fleet in three decades.

86.     On this news, the price of the Company's common stock dropped a remarkable $14.87 per share, or about 47.4%, from $31.34 per share at the close of trading on February 22, 2021 to $16.47 at close on February 23, 2021. The price continued to decline in after-hour trading by an additional $2.40, or about 14.6%, opening on February 24, 2021 at $14.07 per share. In total, over that time, the Company's stock dropped $17.27, or about 55.1%.

87.     On February 24, 2021, the *New York Times* published: "Losing Bid for Postal Contract Proves Costly for Electric-Vehicle Maker[:] Workhorse, a small truck

maker with big ambitions, was counting on the deal for a surge in revenue. Its shares lost $2 billion in value." In that article, Postmaster General Louis Dejoy, explained that Workhorse was never seriously considered especially given that USPS could not afford to purchase an all-electric fleet. The article stated, in pertinent part:

> The choice of Oshkosh left open the possibility of some electrification. The new vehicles will be equipped with either fuel-efficient gasoline engines or electric batteries, and they will be retrofitted to keep pace with advances in electric-vehicle technology, the Postal Service said. But that rollout could be limited. In response to questioning at a House Oversight and Reform Committee hearing on Wednesday, the postmaster general, Louis DeJoy, said the agency's plan called for 10 percent of its new trucks to be electric. Asked by Representative Jackie Speier, a California Democrat, why that figure was not 90 percent, Mr. DeJoy pointed to cost. ***"We don't have the three or four extra billion dollars in our plan right now that it would take to do it," said Mr. DeJoy***[.]

(Emphasis added.)

## DAMAGES TO WORKHORSE

88.     As a direct and proximate result of the Individual Defendants' conduct, Workhorse has lost and expended, and will continue to lose and expend, millions of dollars.

89.     These expenditures include, but are not limited to, legal fees associated with the Securities Class Actions against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators as a result.

90.     These losses include, but are not limited to, lucrative compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

91.     As a direct and proximate result of the Individual Defendants' conduct, Workhorse has also suffered and will continue to suffer a loss of reputation and goodwill, and a discount that will affect the Company's stock going forward due to the Company's and the Individual Defendants' misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiff brings this action derivatively and for the benefit of Workhorse to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Workhorse and violations of the Exchange Act.

93.    Workhorse is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Workhorse. Plaintiff will adequately and fairly represent the interests of Workhorse in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

95.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

96.    A pre-suit demand on the Board of Workhorse is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

97.    Demand is excused as to all of the Directors because each of them faces, both individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make materially false and misleading statements, while five of them engaged in insider sales based on material nonpublic information, for proceeds of approximately $43.2 million. As a result, all of the Directors are incapable of impartially investigating the allegations and deciding whether to pursue this action against either themselves or any other perpetrators of the scheme.

Verified Shareholder Derivative Complaint

98.    In total breach of their fiduciary duties, the Directors, knowingly or recklessly, participated in making and/or causing the Company to make the alleged materially false and misleading statements. The fraudulent scheme was intended to, and did, make the Company appear more profitable and attractive to investors. As a result, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile and excused.

99.    Demand is futile on Defendant Hughes for the following, additional reasons. Defendant Hughes has been the Company's CEO and a Company director since February 2019. He was the Company's Chief Operating Officer and President from August 2016 until January 2019. As the Company admits, he is a nonindependent director. The Company provides Defendant Hughes with his principal occupation for which he receives substantial compensation, including $1,334,750 during Fiscal Year 2020. As CEO, Defendant Hughes was ultimately responsible for all of the false and misleading statements and omissions that were made including those that he personally made during an interview with *CNBC* on August 6, 2020. As the Company's highest officer and as a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. His insider sales before the fraud was exposed, for proceeds of about $14.4 million, demonstrate his motive in facilitating and participating in the fraud. Defendant Hughes is also a defendant in the Securities Class Actions. For these reasons, Defendant Hughes breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

100.    Demand is futile on Defendant Chess for the following, additional reasons. Defendant Chess has been a Company director since October 2013 and Chairman of the Board since December 2015. He is also a member of the Nominating and Corporate Governance Committee. Defendant Chess receives significant compensation for his role

as a director as described above. As a trusted Company director, he conducted little of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. His insider sales before the fraud was exposed, for proceeds of about $1.4 million, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

101.    Demand is futile on Defendant Budde for the following, additional reasons. Defendant Budde has been a Company director since December 2015. He is also the Chair of the Audit Committee. Defendant Budde receives significant compensation for his role as a director as described above. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. In addition, the Company receives property and casualty insurance through AssuredPartners NL, LLC ("Assured"), an indirect subsidiary of AssuredPartners, Inc., where Defendant Budde is Eastern Regions Chief Financial Officer. The Company paid Assured about $121,000 and $86,000 in fees for the years ended December 31, 2020 and 2019. For these reasons, Defendant Budde breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

102.    Demand is futile on Defendant Samuels for the following, additional reasons. Defendant Samuels has been a Company director since December 2015. He is also a member of both the Audit Committee and the Compensation Committee. Defendant Samuels receives significant compensation for his role as a director as described above. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. His insider sales before the fraud was exposed, for proceeds of about $24.5 million, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Samuels breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

103.   Demand is futile on Defendant DeMott for the following, additional reasons. Defendant DeMott has been a Company director since February 2015 and is a member of the Compensation Committee. Defendant DeMott receives significant compensation for his role as a director as described above. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. His insider sales before the fraud was exposed, for proceeds of about $2.7 million, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant DeMott breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

104.   Demand is futile on Defendant Clark for the following, additional reasons. Defendant Clark has been a Company director since October 2018. He is also the Chair of the Compensation Committee and a member of the Audit Committee. Defendant Clark receives significant compensation for his role as a director as described above. As a trusted Company director, he conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. For these reasons, Defendant Clark breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and excused.

105.    Demand is futile on Defendant Mader for the following, additional reasons. Defendant Mader has been a Company director since May 2020. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Mader has receives significant compensation for her role as a director as described above. As a trusted Company director, she conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Her insider sale before the fraud was exposed, for about $240,000 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, Defendant Mader breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and excused.

106.    Demand is futile on Defendant Dedo for the following, additional reasons. Defendant Dedo has been a Company director since May 2020. She is also the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee. Defendant Dedo has receives significant compensation for her role as a director as described above. As a trusted Company director, she conducted little oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. For these reasons, Defendant Dedo breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent or disinterested, and demand upon her is futile and excused.

107.    Demand is futile on the Board for the following, additional reasons.

108.    As described above, five of the Directors directly engaged in insider trading in violation of federal law. Defendants Chess, DeMott, Hughes, Mader, and Samuels, together received proceeds of about $43.2 million due to insider transactions while the

Verified Shareholder Derivative Complaint

Company's stock price was artificially inflated because of false and misleading statements. Therefore, demand in this case is futile as to them and excused.

109.    The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that prevented them from acting independently and in the best interests of the Company and its shareholders. Defendants Chess and Mader worked at General Motors together from 1994 to 2010. In addition, Defendants Budde, Chess, DeMott, and Samuels, have served on the Board together for approximately five years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

110.    Defendants Budde, Clark, Dedo, and Samuels (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. According to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing the integrity of the Company's financial statements and internal controls, its compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

111.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with the

law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

112.  Workhorse has been, and will continue to be, exposed to significant losses and expenditures as a result of the alleged misconduct, but the Directors have not filed any lawsuits against themselves or any others who were responsible in attempt to recover any of the damages Workhorse has suffered and is continuing to suffer. Therefore, any demand upon the Directors would be futile.

113.  The Individual Defendants' conduct could not have been the product of legitimate business judgment as it was based on bad faith and was intentional, reckless, or disloyal misconduct. Therefore, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are incapable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company. Accordingly, demand is excused as being futile.

114.  The acts complained of herein constitute violations of fiduciary duties owed by Workhorse's officers and directors, and such acts are incapable of ratification.

115.  The Directors may be protected against personal liability for their breaches of fiduciary duty by directors' and officers' liability insurance. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for an action brought directly by the Company against the Directors, known, *inter alia*, as the "insured-versus-insured exclusion." Thus, if the Directors were to sue themselves or certain officers of Workhorse, there would be no insurance protection. Therefore, the Directors cannot be expected to bring such a suit. However, if the suit is brought derivatively, as is this action, such insurance coverage, if it exists, will provide a basis for the Company to recover. As a result, demand on the Directors is futile and excused.

116.   If there is no directors' and officers' liability insurance, then the Directors will not cause Workhorse to sue the Individual Defendants since, if they did, they would face a large, uninsured individual liability. In that case, demand is also futile.

117.   For all the above reasons, all of the Directors, and, if not all of them, at least four of them, cannot consider a demand with the requisite disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

118.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

120.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.   Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose that: (1) Workhorse had no indication it would secure the Next Generation Delivery vehicle contract with USPS; (2) USPS was not planning on

electrifying all or most of its fleet due to the extreme cost that would incur; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

122.   The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

123.   Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and issue false and misleading statements and/or omissions of material fact.

124.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors and the approval of the Issuance Proposal.

125.   The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the approval of the Issuance Proposal and the election and/or re-election of Defendants Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo, which allowed them to continue breaching their fiduciary duties to Workhorse.

126.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

127.   Plaintiff on behalf of Workhorse has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

128.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Workhorse's business and affairs.

130.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

131.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Workhorse.

132.  In breach of their fiduciary duties owed to Workhorse, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Workhorse had no indication it would secure the Next Generation Delivery vehicle contract with USPS; (2) USPS was not planning on electrifying all or most of its fleet due to the extreme cost that would incur; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, Workhorse's public statements were materially false and misleading at all relevant times.

133.  The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

134.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

135.    In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $43.6 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

136.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

137.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken

appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

138.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Workhorse has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.   Plaintiff on behalf of Workhorse has no adequate remedy at law.

## **PRAYER FOR RELIEF**

141.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Workhorse, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Workhorse;

(c)    Determining and awarding to Workhorse the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Workhorse and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Workhorse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Workhorse to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Workhorse restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 24, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Mark Kistenmacher am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___19___, 2021.

Mark Kistenmacher